UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SCARBOROUGH-ST. JAMES CORPORATION,   Civil Action No. _____

                         Petitioner,

     - against -   **NOTICE OF REMOVAL**

MADISON REALTY CAPITAL, L.P. and
67500 SOUTH MAIN STREET, RICHMOND LLC,   Bankruptcy Jurisdiction

                         Respondents.
-------------------------------------------------------------X

      **PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. § 1441(b), 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9027, the Respondents, Madison Realty Capital, L.P. ("Madison") and 67500 South Main Street, Richmond, LLC ("67500 South Main LLC") (collectively, the "Respondents"), hereby remove the matter entitled, *Scarborough-St. James Corp. v. Madison Realty Capital, L.P. and 67500 South Main Street, Richmond, LLC*, filed in the Supreme Court of the State of New York, County of New York, Index No. 106561/09 (the "the State Court Proceeding"), to the United States District Court for the Southern District of New York and, in support thereof, respectfully state as follows:

### FACTUAL BACKGROUND

#### The Sale/Leaseback and the Intermediate Agreement

    1.    Scarborough-St. James Corporation ("SSJC") previously owned a shopping center located at 67300-67500 Main Street, Richmond, Michigan (the "Shopping Center").[1]

    2.    Upon information and belief, in 1985, SSJC entered into a sale/leaseback transaction with its affiliate, Richmond Realty Limited Partnership ("RRLP").

---

[1] As explained below, SSJC is a reorganized debtor in a related Chapter 11 bankruptcy case pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 03-17966(JMP).

3. By this transaction, SSJC sold the Shopping Center to RRLP and then "rented" the property from RRLP pursuant to an Intermediate Net Lease, which was amended in June 2006 by an Amended and Restated Intermediate Lease (the "Intermediate Agreement", a copy of which is attached as Exhibit "A").

4. The Intermediate Agreement was not a true, bona fide lease of real property.

5. Rather, the Intermediate Agreement was a financing transaction.

6. SSJC did not and does not occupy space at the Shopping Center.

7. The Intermediate Agreement was not recorded in the Macomb County, Michigan real property records until April 17, 2009. *See* Liber 19749, page 632.

## The Bankruptcies

8. On December 17, 2003, SSJC filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 03-17966(JMP)).

9. On November 22, 2006, RRLP filed a petition under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court. RRLP's bankruptcy was jointly administered with that of SSJC until RRLP's case was dismissed on December 4, 2008.

10. SSJC's bankruptcy case is still pending and, upon information and belief, SSJC is operating pursuant to a Plan of Reorganization confirmed by the Bankruptcy Court on June 11, 2008 (the "Plan").

## The DIP Order

11. At the time of RRLP's bankruptcy, RRLP owned the Shopping Center.

12. In conjunction with the bankruptcies of RRLP and SSJC, Madison provided debtor-in-possession ("DIP") financing to RRLP in the amount of $3,100,000.00. The

Bankruptcy Court approved the DIP loan by Order dated February 21, 2007, which was amended by the Bankruptcy Court's Order dated April 20, 2007 (the "DIP Order"), a copy of which is attached as Exhibit "B".

13. The DIP Order granted the debtors' joint motion dated January 25, 2007 ("DIP Motion") for an order authorizing the post-petition secured financing. A copy of the DIP Motion is attached as Exhibit "C". The DIP Motion expressly contemplated the assignment of, and security interest in, all current and future leases, rents, and other income related to the Shopping Center. *See* DIP Motion at ¶ 45 and Exhibit A, Loan Agreement, at page 1.

14. Pursuant to the DIP Order, RLLP executed and delivered to Madison a promissory note in the original principal amount of $3,100,000.00 (the "DIP Note"), a copy of which is attached as Exhibit "D".

15. The DIP Note was secured by a mortgage on the Shopping Center (the "DIP Mortgage"), a copy of which is attached as Exhibit "E".

16. The DIP Mortgage was recorded in the real property records of Macomb County, Michigan on May 14, 2007. *See* Liber 18700, page 317.

17. The DIP Note and obligations were also secured by an unconditional security interest in the Shopping Center's leases and rents and by a perfected priming lien, senior in all respects to any and all present and future liens, claims, interests or encumbrances, if any, "including, without limitation, any and all pre-petition and post-petition liens and security interests held by Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R or RGE, as further described in the DIP Loan Agreement." *See* DIP Order at ¶ 6 (c).

18. The DIP Order was recorded in the real property records of Macomb County, Michigan on May 14, 2007. *See* Liber 18700, page 298.

3

19. Pursuant to the DIP Order, the Bankruptcy Court retained "exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order . . . or other injunctive relief requested." *See* DIP Order at ¶ 17(b).

20. The DIP Order also provided that the Bankruptcy Court would maintain jurisdiction even after a dismissal of RRLP's bankruptcy case "for purposes of enforcing the liens, security interests and Superpriority Claims of the Lenders, as the case may be." *Id.* at ¶ 23.

21. Pursuant to SSJC's Plan, the Bankruptcy Court also retained jurisdiction to determine all motions and matters filed after the effective date of the Plan, to determine all controversies that may arise in connection with the enforcement of the Plan and in connection with any agreement made as part of the Plan, and to hear other matters related to the Plan and not inconsistent with Chapter 11. *See* Order Confirming the Plan (attached as part of Exhibit "F") at p. 4 and Plan (attached as part of Exhibit "F") at pp. 20-22.

### The Defaults, the September 2008 Agreement and the Foreclosure

22. The DIP loan went into default, and Madison initiated foreclosure proceedings under Michigan law. The foreclosure sale was originally scheduled for September 26, 2008.

23. On September 24, 2008, SSJC and Madison entered into an agreement (the "September 2008 Agreement") which, among other things, postponed the foreclosure sale for four weeks to allow SSJC time to try to satisfy its obligations to Madison. A copy of the September 2008 Agreement is attached as Exhibit "G".

24. Pursuant to the September 2008 Agreement, SSJC waived all claims against Madison including all claims relating to Madison's enforcement of the loan documents and Madison's rights to collect the rents at the Shopping Center.

25. On or about October 23, 2008, SSJC commenced an adversary proceeding in the Bankruptcy Court seeking to enjoin the foreclosure sale ("October 2008 Action").

26. In its accompanying motion for an immediate stay of the foreclosure sale, SSJC asserted that it would suffer irreparable harm if the foreclosure sale proceeded. *See* motion dated October 22, 2008, at paragraph 2, a copy of which (without exhibits) is attached as Exhibit "H"; *see also* Declaration of Michael T. Conway dated October 22, 2008, at paragraph 2, a copy of which is attached as Exhibit "I".

27. SSJC was not the owner of the Shopping Center. Its sole interest related to the preservation of the Intermediate Agreement.

28. No injunction was issued.

29. On October 24, 2008, Madison foreclosed on the Shopping Center and immediately assigned its bid to 67500.

30. On or about January 13, 2009, after SSJC's attempts to block the foreclosure failed, the parties filed a stipulation of dismissal of the October 2008 Action, a copy of which is attached as Exhibit "J".

31. The Shopping Center was not redeemed by RRLP or any other party within the redemption period allowed by Michigan law.

32. 67500 is now the fee simple owner of the Shopping Center.

### SSJC's Misconduct and the State Court Proceeding

33. After the redemption period expired, 67500 began contacting tenants at the Shopping Center and directing them to pay rents to 67500 in accordance with its rights.

34. SSJC interfered with 67500's rights to collect the rents at the Shopping Center.

5

35. In an attempt to avoid the jurisdiction of the Bankruptcy Court -- which had already entered the DIP Order and denied SSJC's prior efforts to block the foreclosure -- SSJC purported to commence an arbitration proceeding before JAMS (the "Arbitration Proceeding"). A copy of SSJC's Demand for Arbitration Before JAMS (the "Arbitration Demand") is attached as Exhibit "K". The Arbitration Demand invoked an arbitration clause in the Intermediate Agreement.

36. In addition, SSJC commenced a proceeding in the New York County Supreme Court to obtain injunctive relief in aid of the purported arbitration (the "State Court Proceeding"). The documents that SSJC filed in the State Court Proceeding are attached collectively as Exhibit "L".

37. In the State Court Proceeding, SSJC alleges, among other things, that it has the right to collect rents from tenants at the Shopping Center despite: (i) SSJC's express waiver of such claims in the September 2008 Agreement; (ii) the provision of the DIP Order granting Madison priming liens on all of RRLP's assets, which liens were senior to all liens, claims, encumbrances and interests, including those held by SSJC; and (iii) the extinguishment of any subordinate rights SSJC had upon the foreclosure of the DIP Mortgage.

38. The resolution of the dispute between Respondents and SSJC requires, among other things, interpretation and enforcement of the Bankruptcy Court's DIP Order. As set forth below, removal is appropriate.

### Respondents' Adversary Action

39. Based on the foregoing, Respondents commenced an adversary proceeding in SSJC's bankruptcy case on June 3, 2009. A copy of the Adversary Complaint (without exhibits) is attached as Exhibit "M".

# ARGUMENT

## POINT I

### REMOVAL IS PROPER

40. 28 U.S.C. § 1452 provides that a "party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." *See* 28 U.S.C. § 1452(a).

41. Removal is proper as the Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), which grants the Bankruptcy Court jurisdiction over all "proceedings arising under title 11, or arising in or related to cases under title 11." As the Second Circuit has explained, through these removal provisions, "Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with *all* matters connected with the bankruptcy estate." *Cal. Pub. Employees' Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86, 103 (2d Cir. 2004) (emphasis in original). "In its every detail, Section 1452(a) is designed to further Congress's purpose of centralizing bankruptcy litigation in a federal forum." *Id.*

42. The issues raised in the state court petition clearly relate to a bankruptcy proceeding -- indeed, they involve, among other things, the interpretation and enforcement of <u>the Bankruptcy Court's own DIP Order</u>. "It is well-settled that [a bankruptcy] Court has authority to interpret and enforce its own orders." *Allis-Chalmers Corp. v. Goldberg (In re Hartman Mat. Handling Sys., Inc.)*, 141 B.R. 802, 810 (Bankr.S.D.N.Y. 1992) (citing *U.S. v. Unger*, 949 F.2d 231, 234 (8th Cir. 1991) (a bankruptcy court may explicitly retain jurisdiction over aspects of a

plan related to its administration and interpretation)). As such, the issues in the State Court Proceeding are closely related to the bankruptcy case, and removal is proper on that basis.

43. Moreover, this action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) as one requiring the determination of the validity, extent and priority of liens, and pursuant to 28 U.S.C. § 157(b)(2)(O) as a proceeding affecting the adjustment of the debtor-creditor relationship.

44. As the Second Circuit has explained, bankruptcy judges "have the authority to hear and determine all . . . core proceedings arising under title 11." *U.S. Lines, Inc. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 636 (2d Cir. 1999). Whether a contract case is "core" depends on two elements: "(1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization. The latter inquiry hinges on the nature of the proceeding." *Id.* at 637 (internal quotation marks and citations omitted).

45. Proceedings can be core "by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings . . . or (2) the proceedings directly affect a core bankruptcy function." *Id.* Core bankruptcy functions include "[f]ixing the order of priority of creditor claims against a debtor, . . . plac[ing] the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors, . . . and administer[ing] all property in the bankrupt's possession." *Id.* (internal quotation marks and citations omitted) (modifications in original). There is no question that this standard is met here.

46. Finally, this action is also removable pursuant 11 U.S.C. § 1441(b) which provides that "[a]ny civil action of which the district courts have original jurisdiction founded on

8

a claim or right arising under the Constitution, treaties or laws of the United States shall be removable." In both the DIP Order and the Order Confirming the Plan, the Bankruptcy Court has retained exclusive jurisdiction under 28 U.S.C. § 1334 over this matter and, therefore, this action is removable under 28 U.S.C. § 1441(b) as well.

## POINT II

## THE NOTICE OF REMOVAL IS TIMELY

47. Pursuant to Bankruptcy Rule 9027(a)(2), a Notice of Removal may be filed within thirty (30) days after a party receives notice of an action.

48. Since Madison was served with the state court petition on May 14, 2009, this Notice of Removal is timely.

49. Pursuant to Bankruptcy Rule 9027(c), written notice of the filing of this Notice of Removal will be served upon SSJC, and will be filed in the Supreme Court of the State of New York, County of New York.

50. By filing this Notice of Removal, the Respondents do not waive any of the rights and remedies they may have. The Respondents shall request from the Clerk of the Supreme Court of the State of New York, County of New York, certified or attested copies of all records and proceedings in such Court, and certified or attested copies of all docket entries therein, including a copy of this Notice of Removal, and will file the same with this Court.

Dated: June 8, 2009
Mineola, New York

                        WESTERMAN BALL EDERER MILLER
                                & SHARFSTEIN, LLP

                        _/s/ Jeffrey Miller_
                        Jeffrey A. Miller, Esq. (JM 6352)
                        Eric G. Waxman III, Esq. (EW 0498)
                        170 Old Country Road, Suite 400
                        Mineola, New York 11501
                        (516) 622-9200
                        *Attorneys for Madison Realty Capital, L.P. and*
                        *67500 South Main Street, Richmond, LLC*

204734